UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

ALFONZO C. DUNCAN,
STEPHONIA DUNCAN,

      Plaintiffs,

      v.                              Case No. 13-C-0437

MARK MANNING,
FREDRICKA MANNING,

      Defendants.

DECISION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO DISMISS (DOC. 4)

Alfonzo Duncan was the head varsity basketball coach at St. John's Northwestern Military Academy ("SJNMA") until his termination shortly after an altercation with Mark and Fredricka Manning. Alfonzo sues the Mannings,[1] alleging that (1) Mark assaulted and battered him, (2) Mark and Fredricka intentionally and maliciously caused him to be terminated from SJNMA, and (3) Mark and Fredricka violated Wis. Stat. § 134.01 by "concerting together" for the purpose of willfully and maliciously injuring Alfonzo's reputation and profession. Alfonzo's wife, Stephonia Duncan, claims that she has suffered from loss of society and companionship from Alfonzo's inability to socialize and interact with others. (Doc. 1, ¶ 28.)

The Mannings move to dismiss all claims under Fed. R. Civ. P. 12(b)(6).

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). Rule

---

[1] Because this case involves claims of a married couple with the same last name against a married couple with the same last name, the court will refer to each party by his or her first name. When the court refers to both Mark and Fredricka they may be called "the Mannings."

12(b)(6) requires a plaintiff to clear two hurdles. *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). First, the complaint must describe the claim in sufficient detail to give a defendant fair notice of the claim and the grounds on which it rests. *Id.* Although specific facts are not necessary, "at some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8." *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007). Mere labels and conclusions, naked assertions devoid of factual enhancement, or a formulaic recitation of the elements of a cause of action will not do. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 127 S. Ct. 1937, 1949 (2009). In other words, the complaint must set forth factual matter, not conclusions. *See id.*

Second, the complaint must set forth a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007); *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007). The "allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads [himself] out of court." *EEOC*, 496 F.3d at 776 (citing *Bell Atl. Corp.*, 550 U.S. at 555-56, 569 n.14 (2007)). The facts alleged in the complaint must provide "more than a sheer possibility" that the defendant is liable. *Iqbal*, 556 U.S. at 678.

When considering a Rule 12(b)(6) motion, the court must construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts and drawing all possible inferences in the plaintiff's favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). Thus, the allegations described below are assumed true.

ALLEGED FACTS

From July 2, 2011, until March 6, 2012, Alfonzo was Director of Athletics and Head Varsity Basketball Coach at SJNMA in Delafield, Wisconsin. (Doc. 1, ¶¶ 7, 22.) On February 28, 2012, the SJNMA varsity basketball team, accompanied by Alfonzo, traveled to Columbus High School for a game. (Doc. 1, ¶ 8.) Mark and Fredricka, a married couple whose son played on SJNMA's varsity basketball team, attended the game at Columbus High School. (Doc. 1, ¶ 5; *see id.* ¶ 9.)

After the game, Mark and Fredricka left their bleacher seats and chased after Alfonzo, confronting him in an aggressive manner by the team's locker room. (Doc. 1, ¶ 9.) They "verbally assaulted" Alfonzo while Mark pointed his finger at Alfonzo's chest. (Doc. 1, ¶ 9.) Mark yelled at Alfonzo, stating "Don't get smart with me," and continued to approach Alfonzo in a threatening manner. (Doc. 1, ¶ 10.) Mark backed Alfonzo against a wall, intentionally bumped Alfonzo with his lower body, and then "lunged his head forward to strike [Alfonzo] in the head, causing physical pain." (Doc. 1, ¶ 11.) Alfonzo began to fear for his life. (Doc. 1, ¶ 11.) Mark and Fredricka continued to scream at Alfonzo in front of numerous players, coaches, parents, students, and others, calling Alfonzo an "asshole" and a "liar." (Doc. 1, ¶ 12.) Finally, other parents and coaches stepped forward to intervene and attempted to restrain Mark "from further physically assaulting" Alfonzo. (Doc. 1, ¶ 12.)

Ben Schambow, the Columbus High School basketball coach, attempted to physically restrain Mark and Fredricka and repeatedly ordered them to leave the gymnasium. (Doc. 1, ¶ 13.) The Mannings ignored Schambow's demands and continued to scream at Alfonzo until Schambow told them that if they did not immediately leave the

3

gymnasium he would telephone the police. (Doc. 1, ¶ 13.) Mark "continued to try to physically assault" Alfonzo even after being restrained by Schambow. (Doc. 1, ¶ 14.) Ultimately, the Mannings were escorted out of the gymnasium by Columbus High School personnel. (Doc. 1, ¶ 14.)

The following day, February 29, 2012, Mark sent an early morning email to John Thornburg, the SJNMA Dean of Students and the SJNMA President, Jack Albert, Jr. (Doc. 1, ¶¶ 15, 19.) Thornburg met with Mark that morning at 7:00 a.m. (Doc. 1, ¶ 15.) During the meeting, Mark demanded that Alfonzo be terminated from his position and made "intentionally false and malicious statements regarding the incident of the previous evening." (Doc. 1, ¶ 16.) Later that day, Alfonzo met with the SJNMA Vice-President of Business, Steve Celichowski. Celichowski told Alfonzo "that the Dean had met with the Mannings regarding the basketball game incident and that, consequently, [Alfonzo] was immediately placed on administrative leave." (Doc. 1, ¶ 17.)

On March 1, 2012, SJNMA President Albert returned to campus and advised Alfonzo that he could return to work. (Doc. 1, ¶ 19.) Alfonzo returned to work but was fearful of further physical attacks by Mark and had nightmares of being attacked again. (Doc. 1, ¶ 20.) Alfonzo locked his office doors and put a baseball bat in his office for personal protection. (Doc. 1, ¶ 20.) Alfonzo coached one playoff game on the weekend of March 2, 2012, under allegedly extreme emotional distress and fear for his personal safety. (Doc. 1, ¶ 21.)

On March 6, 2012, Alfonzo was terminated from his position at SJNMA. According to the Complaint, the Mannings' false and malicious statements caused Alfonzo's termination. (Doc. 1, ¶ 22.) On March 7, 2012, Mark was interviewed by a Columbus,

4

Wisconsin, police officer. Mark knowingly gave false information to the officer by stating that no physical altercation occurred between Alfonzo and him at the basketball game on February 28, 2012. (Doc. 1, ¶ 18.)

Following his termination, Alfonzo was medically diagnosed with major depression and post-traumatic stress disorder, attributed entirely to these experiences. (Doc. 1, ¶ 23.) Alfonzo was informed that his recovery would be difficult and slow and that he would probably need to relocate his family, which he did. (Doc. 1, ¶ 23.) Consistent with his psychiatrist's diagnosis, Alfonzo has been unable to return to any form of employment and remains fearful of other people. (Doc. 1, ¶ 23.)

## DISCUSSION

A. Alfonzo's Claim of Assault and Battery Against Mark

Alfonzo claims that Mark intentionally assaulted and battered him "by striking him in the head causing physical pain and severe emotional distress." (Doc. 1, ¶ 24.) In response, Mark contends that Alfonzo fails to set forth enough facts to satisfy the standards of *Bell Atlantic* and *Iqbal*, that the Complaint fails to assert that actual contact occurred, and that the omission of any physical injury is fatal to Alfonzo's intentional tort claims.

In Wisconsin, an assault claim requires that the defendant (1) intended to cause physical harm to the plaintiff and (2) acted to cause the plaintiff to reasonably believe the defendant had the present intent and ability to harm the plaintiff. Wis. JI-Civil 2004.[2] The requirement that the defendant intended to cause bodily harm means that the defendant

---

[2] The work of the criminal jury instructions committee can be persuasive regarding the elements of a state-law claim. *See State v. Mueller*, 201 Wis. 2d 121, 145, 549 N.W.2d 455, 465 (Ct. App. 1996).

5

"had the mental purpose to cause bodily harm" or "was aware that his or her conduct was practically certain to cause bodily harm" to the plaintiff or another person. *Id*.

The Complaint sets forth sufficient facts for an assault claim. It asserts that Mark chased and confronted Alfonzo in an aggressive manner, pointed his finger at Alfonzo's chest, called Alfonzo an "asshole" and a "liar," intentionally bumped and then head-butted Alfonzo, and had to be physically separated from Alfonzo and restrained. Moreover, the Complaint states that Mark's interaction with Alfonzo was such that Schambow ordered the Mannings to leave the gym, and they had to be physically escorted out.

It is plausible that Mark intentionally intended to cause physical harm to Alfonzo when he pointed, bumped, and head-butted him. Additionally, it is reasonable to conclude that an aggressive confrontation as described would lead Alfonzo to believe that Mark had the intent and ability to cause him harm. That Mark had to be physically restrained and escorted from the gymnasium supports a reasonable inference that Mark had the intent and ability to harm Alfonzo.

In response to Mark's motion to dismiss the battery claim, Alfonzo points to the state-law tort of battery by offensive contact. Such a battery occurs if (1) the defendant intentionally caused offensive contact with the plaintiff and (2) the plaintiff did not consent to the contact. Wis. JI-Civil 2005.5. Contact is offensive if a reasonable person in the plaintiff's situation would have been offended by the contact. *Id*. The intent requirement means that the defendant had the mental purpose to cause the offensive contact "or was aware that his or her conduct was practically certain" to do so. Wis. JI-Civil 2005.5.

The Complaint sufficiently asserts facts showing that Mark intentionally caused offensive contact with Alfonzo by bumping him with his lower body and head-butting him.

6

Mark contends that Alfonzo fails to assert actual contact—that Alfonzo alleges only that Mark "lunged his head forward to strike Mr. Duncan in the head" but does not assert that contact occurred. However, the argument is frivolous. Alfonzo alleges that Mark "bumped [Alfonzo] with his lower body." Further, the allegation is that Mark "lunged his head forward to strike Mr. Duncan in the head, *causing physical pain*." (Doc. 1, ¶ 11 (emphasis added).) The italicized words confirm that contact occurred. In addition, Alfonzo alleges that other parents then stepped forward and "attempted to restrain Mr. Manning from *further* physically assaulting Mr. Duncan" and that Schambow "witnessed Mr. Manning's physical assault of Mr. Duncan" (Doc. 1, ¶¶ 12, 13 (emphasis added)), again confirming that a physical assault occurred by Mark's actions in bumping and lunging (or head-butting). Finally, the Complaint specifically asserts in the statement of claim that Mark battered Alfonzo "by striking him in the head." (Doc. 1, ¶ 24.)

It is plausible that a reasonable person in Alfonzo's situation would have been offended by Mark's contact. Moreover, any reasonable reading of the Complaint supports the conclusion that Alfonzo did not consent to the contact.

Mark's final argument pertaining to the assault and battery claims is that Alfonzo failed to assert the required physical injury to trigger damages for emotional distress. In Wisconsin, intentional tort claims other than the tort of intentional infliction of emotional distress require "substantial other damages" in addition to emotional distress damages. *Anderson v. Cont'l Ins. Co.*, 85 Wis. 2d 675, 694, 271 N.W.2d 368, 378 (1978). What "substantial other damages" means is not set in stone. "Indeed, the phrase 'substantial other damages' has remained largely undefined and the few attempts to define the term have led to inconsistent results. *Musa v. Jefferson Cnty. Bank*, 2001 WI 2, ¶ 25, 240 Wis.

7

2d 327, ¶ 25, 620 N.W.2d 797, ¶ 25.  Substantial damages have been defined at least once as meaning more than nominal damages, a sum worth having, and "considerable in amount and intended as a real compensation for a real injury."  *Jost v. Dairyland Power Coop.*, 45 Wis. 2d 164, 171, 172 N.W.2d 647, 651 (1969).

Mark argues that Alfonzo has not alleged physical injury from this altercation and therefore cannot receive damages for emotional distress.  According to Mark, the day after the altercation Alfonzo told police that he "did not receive any pain or injury during this altercation" and he did not seek medical treatment  (Doc. 8 at 8, Ex. B.)

The court declines to consider the police report referenced by the parties in and attached to their briefs.  Although the Complaint addresses Mark's statement to police on March 7, it does not mention a police report by Alfonzo on February 29.  Thus, the report falls outside matters discussed in the pleadings.  Further, the Complaint speaks of physical pain suffered by Alfonzo as a result of the head-butt.  Such pain cannot be deemed nominal as a matter of law.  A head-butt could be a fairly severe contact.  Thus, Alfonzo has alleged enough facts to demonstrate a plausible claim that he suffered "substantial other damages" when Mark head-butted him.[3]  Consequently, Mark's motion to dismiss on the assault and battery claims must be denied.

The Complaint did not expressly state a claim for the intentional infliction of emotional distress.  However, in opposition to the motion to dismiss Alfonzo discusses such a claim.  That the Complaint did not expressly invoke this is not a concern at this

---

[3] But even if the report is considered, the motion to dismiss must be denied.  In the police report Alfonzo told the police that "[m]y head went backwards and I lost my balance" after the head-butt. (Doc. 8, Ex. B at 2.)  Such a head-butt could give rise to substantial other damages, even if Alfonzo at that time said he was not experiencing pain.

8

stage. A complaint need not identify a legal theory, and specifying an incorrect theory is not fatal. *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir.1992). Therefore, this court will address Alfonzo's intentional infliction of emotional distress claim.

For intentional infliction of emotional distress claims, no physical damages need be alleged or proved. However, additional limitations are imposed. *Anderson*, 85 Wis. 2d at 694-95. A claim for intentional infliction of emotional distress has four elements: (1) the defendant behaved as he did for the purpose of causing emotional distress; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct was a cause-in-fact of the plaintiff's injury; and (4) the plaintiff suffered an extreme disabling emotional response to the defendant's conduct. *Id.* at 695; *Alsteen v. Gehl*, 21 Wis. 2d 349, 359-61, 124 N.W.2d 312, 318 (1963). It appears that the facts alleged in the Complaint satisfy elements (2) through (4).

However, the Complaint is devoid of facts showing that Mark acted for the purpose of causing Alfonzo emotional distress. Causing emotional distress must be the direct purpose of the actions and not a by-product of the action. *See Rabideau v. City of Racine*, 2001 WI 57, ¶ 36, 243 Wis. 2d 486, ¶ 36, 627 N.W.2d 795, ¶ 36. The Complaint charges that Mark caused Alfonzo to be terminated and acted to injure his profession and reputation, but it does not state or imply that the reason was to cause Alfonzo emotional distress. The reason for Mark's actions is not expressly alleged, but it may be reasonably interpreted as suggesting that the cause of Mark's actions had something to do with his son and Alfonzo's coaching of the basketball team. Because the Complaint offers no facts or allegations supporting a finding that Mark acted for the purpose of causing Alfonzo

emotional distress, it does not state a plausible claim for intentional infliction of emotional distress.[4]

B.  Alfonzo's Termination Claim Against Mark and Fredricka

The Complaint charges that Mark and Fredricka intentionally and maliciously caused Alfonzo to be terminated from SJNMA. In his brief, Alfonzo clarifies this claim as one for tortious interference with contract.

Wisconsin law permits a tortious interference with contract claim in the case of an at-will employee. *Lorenz v. Dreske*, 62 Wis. 2d 273, 286, 214 N.W.2d 753, 760 (1974); *Wolf v. F & M Banks*, 193 Wis. 2d 439, 534 N.W.2d 877 (Ct. App. 1995). The elements of a claim for tortious interference with a contract are (1) the plaintiff had a current or prospective contractual relationship with a third party; (2) the defendant interfered with that contractual relationship; (3) the interference was intentional; (4) a causal connection exists between the defendant's interference and the plaintiff's damages; and (5) the defendant was not justified or privileged to interfere. *Wolnak v. Cardiovascular & Thoracic Surgeons of Cent. Wisconsin, S.C.*, 2005 WI App 217, ¶ 14, 287 Wis. 2d 560, ¶ 14, 706 N.W.2d 667, ¶ 14. Causation exists where the defendant's actions are a "substantial factor" in producing the harm to the plaintiff. *Id.*, ¶ 15.

The Mannings contend that the Complaint fails to set forth sufficient facts regarding causation. However, the Complaint has presented sufficient facts and a plausible case for tortious interference with Alfonzo's at-will employment contract. The Mannings, a married couple, together started the altercation with Alfonzo at the basketball game. Within hours

---

[4] In the event discovery leads to facts supporting this element of intent, Alfonzo can raise the issue of amending the complaint.

Mark emailed the SJNMA Dean of Students and President and, in response, had a meeting with Dean of Students Thornburg at 7:00 a.m. the next morning. The Complaint asserts that during the meeting Mark lied about the incident the night before and demanded that Alfonzo be terminated. Importantly, the same day, February 29, 2012, Alfonzo met with an SJNMA vice president, who told Alfonzo that *as a consequence of the Mannings' meeting* with Thornburg Alfonzo was being placed on administrative leave. A reasonable inference is that it was not Alfonzo's part in the altercation that led to his termination but rather what was said by Mark during his meeting with Thornburg.

The Mannings contend that Alfonzo provides only naked assertions about Mark's false and malicious statements during the meeting with Thornburg, pointing to paragraph 22 of the Complaint, which asserts that Mark and Fredricka's false and malicious statements "were causative of [Alfonzo's] termination." They contend that Alfonzo must assert what the false statements were; however, they do not argue that some heightened pleading standard applies. Great detail is not required regarding a meeting at which Alfonzo was not present. Alfonzo suggests that Mark lied to Thornburg about the incident the night before and that as a result of those lies and Mark's demands for termination Alfonzo was placed on leave. The allegation that the Mannings' false statements caused the termination then extends the implication from the lies made at the meeting with Thornburg, resulting in administrative leave, to the actual termination. That is sufficient for notice pleading.

The Mannings point out that Alfonzo returned to work on March 1 when President Albert returned to campus and that Alfonzo coached another game. They argue that the return to work suggests that no causal connection exists. However, Alfonzo was

11

terminated just one week after Mark met with the Dean. Taking the facts in Alfonzo's favor, his return to work for a few short days does not sever the connection between Mark's lies and demands on February 29 and the termination. Alfonzo has pled enough facts and a plausible claim that the Mannings' actions were a substantial factor in his termination from SJNMA.

Finally, the Mannings contend that the Complaint failed to assert that their interference was improper. They argue that they were justified or privileged to meet with the Dean about the basketball game incident. But a mere meeting with the Dean is not the alleged impropriety; of course parents can meet with a Dean about an incident at a school athletic event. The impropriety was the intentionally false statements allegedly made at the meeting. Alfonzo asserts that Mark lied to the Dean and demanded that Alfonzo be terminated based on those lies. Taking the facts in Alfonzo's favor, the demand for a coach's termination based on intentional falsehoods sufficiently qualifies as action without justification or privilege.

The court notes that Alfonzo brings this claim against both Mark and Fredricka, but paragraph 15 of the Complaint asserts that only Mark met with and lied to the Dean on February 29. However, the Complaint also asserts that Celichowski told Alfonzo that the Dean had met with "the Mannings" regarding the incident, which led to Alfonzo's administrative leave. (Doc. 1, ¶ 17.) Reading the Complaint in Alfonzo's favor, it implies that Fredricka was possibly at the meeting or that Mark was speaking for both of them when he met with the Dean.

In sum, Alfonzo's claim of interference with contract survives the motion to dismiss.

C. Alfonzo's Conspiracy Claim Against Mark and Fredricka

The Complaint charges that Mark and Fredricka violated Wis. Stat. § 134.01 "by concerting together for the purpose of willfully and maliciously injuring Alfonzo Duncan's reputation and profession by making false statements to the Dean of Students and President of SJNMA." (Doc. 1, ¶ 26.) Wisconsin law prohibits two or more persons from combining, associating, agreeing, mutually undertaking, or concerting together "for the purpose of willfully or maliciously injuring another in his or her reputation, trade, business or profession." Wis. Stat. §134.01. Although § 134.01 is a criminal statute, it provides a basis for civil tort liability, too. *Brew City Redev. Group, LLC v. Ferchill Group*, 2006 WI 128, ¶ 19, 297 Wis. 2d 606, ¶ 19, 724 N.W.2d 879, ¶ 19.

However, a claim under § 134.01 requires facts showing "'some agreement, explicit or otherwise, between the alleged conspirators on the common end sought and some cooperation toward the attainment of that end.'" *Bartley v. Thompson*, 198 Wis. 2d 323, 342, 542 N.W.2d 227, 234 (Ct. App. 1995) (quoting *Augustine v. Anti-Defamation League of B'nai B'rith*, 75 Wis. 2d 207, 216, 249 N.W.2d 547, 552 (1977)). "Mere similarity of conduct among various persons and the fact that they may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish the existence of a conspiracy." Wis JI-Civil 2800 (1995); *Bartley*, 198 Wis. 2d at 345. It is not enough that the defendants may have acted in concert or with a common goal. *Bartley*, 198 Wis. 2d at 342. A "general allegation of conspiracy, without a statement of the facts constituting that conspiracy, is only an allegation of a legal conclusion and is insufficient to constitute a cause of action." *Id*.

The Complaint presents a plausible claim for a § 134.01 conspiracy between Mark and Fredricka. It sets forth more than the bare legal conclusion that the Mannings concerted together. Although the Complaint does not explicitly allege that an agreement existed, an agreement can be reasonably inferred from allegations regarding the Manning's mutual verbal assault of Alfonzo after the game; Celichowski's statement that the Dean "had met with the Mannings" regarding the incident, resulting in Alfonzo being placed on leave (Doc. 1, ¶ 17); the false and malicious statements by both Mark and Fredricka, which caused Alfonzo's termination (Doc. 1, ¶ 22); and the claims that the Mannings are married and have a son on the SJNMA basketball team. Celichowski's statement in particular reasonably suggests that in the email or during the meeting with Thornburg, Mark was relaying opinions and demands common to him and his wife regarding their son's basketball team. "To concert" as a verb means "to devise, plan, or frame together." New Lexicon Webster's Dictionary of the English Language 202 (1989). Although joint planning is not expressly alleged in the Complaint, it can reasonably be inferred that between their combined verbal assault of Alfonzo after the basketball game, the email and the meeting with the Dean hours later, the Mannings planned or coordinated some action regarding attainment of a common end. Read in the light most favorable to Alfonzo, the Mannings were not merely acting simultaneously and similarly in chasing Alfonzo and yelling at him after the game; they were acting together as a couple in lying to the Dean and demanding Alfonzo's termination.

The Mannings point to the *Bartley* case, in which a former member of the Wisconsin Tax Appeals Commission accused Governor Tommy Thompson and another man, Mark Musolf, of conspiring to threaten Bartley with non-reappointment to get him to change

14

rulings in a pension case. *Id*. at 343. Bartley based his case solely on Musolf's remarks to him, and the Wisconsin Court of Appeals ruled that no facts suggested that Thompson agreed that Musolf should make the remarks, that Thompson put pressure on Musolf to make the remarks, or that Thompson even knew about the remarks. *Id*. at 344-45. The situation in this case is distinguishable from *Bartley*. Fredricka acted together with Mark immediately following the game. That fact, Celichowski's statement that "the Mannings" met with the Dean, plus the allegation that Fredricka's false statements caused Alfonzo's termination suggest that Fredricka not only knew what Mark was doing the morning after the game but agreed that Mark should say what he did in his email and during his meeting with the Dean.

This case is similarly distinguishable from *Pappas v. County of Milwaukee*, No. 2011AP678, 2012 WI App 88, 2012 WL 2300082 (Wis. Ct. App. June 19, 2012). Pappas's complaint alleged only that certain defendants "were part of a conspiracy by Defendant Aring and other unnamed co-conspirators to act in concert for the purpose of willfully and/or maliciously injuring Plaintiff's reputation and profession." *Id.*, ¶ 28. That allegation was a mere conclusion. Pappas failed to set forth facts indicating that the defendants cooperated with each other. *Id.* Again, here, as set forth above, the Complaint provides factual allegations suggesting that the Mannings acted together in cooperation or combination or pursuant to a common plan. Therefore, the motion to dismiss will be denied.

D.   Stephonia's Claim for Loss of Society and Companionship

Stephonia's claim for loss of society and companionship based on Alfonzo's emotional distress is also set forth in the Complaint. The Mannings' sole argument for

15

dismissal is that Stephonia's claim fails if Alfonzo's claims are dismissed. As most of Alfonzo's claims survive the motion to dismiss, Stephonia's derivative claim for loss of society and companionship survives as well.

CONCLUSION

For the foregoing reasons,

IT IS ORDERED that the Mannings' motion to dismiss (Doc. 4) is granted as to Alfonzo's intentional infliction of emotional distress claim (not set forth specifically in the Complaint but argued in his brief) but is otherwise denied.

Dated at Milwaukee, Wisconsin, this 7th day of February, 2014.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE