UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

ALFONZO C. DUNCAN,
STEPHONIA DUNCAN,

      Plaintiffs,

      v.                                     Case No. 13-C-0437

MARK MANNING,
FREDRICKA MANNING,

      Defendants,

AMERICAN FAMILY MUTUAL
INSURANCE COMPANY,

      Intervenor.

---

DECISION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION
FOR DECLARATORY JUDGMENT (DOC. 23)

Alfonzo and Stephonia Duncan sue Mark and Fredricka Manning over incidents that followed a high-school basketball game and Alfonzo Duncan's termination as basketball coach at St. John's Northwestern Military Academy (SJNMA). The Mannings' insurer, American Family Mutual Insurance Company, intervened and moves for a declaration that it owes the Mannings no duty to defend and that no coverage exists under the pertinent policies.

Although American Family referenced only Fed. R. Civ. P. 57 and 28 U.S.C. § 2201 regarding its motion, the motion is formatted as though it is one seeking summary judgment, especially because it included proposed statements of material fact. Therefore, the court will analyze the motion under Fed. R. Civ. P. 56.

Summary judgment is proper if the depositions, documents or electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or

other materials show that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). To establish that a question of fact is "genuine," the nonmoving party must present specific and sufficient evidence that, if believed by a jury, would support a verdict in its favor. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating it is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend each element of its cause of action, showing that there is a genuine issue for trial. *Id.* at 322-24. In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson*, 477 U.S. at 255.

STATEMENT OF UNDISPUTED FACTS

With a few exceptions, the Mannings admitted most of American Family's proposed statements of fact. American Family admitted several of the Mannings' proposed statements of fact and responded that it had no information to admit or deny others. Thus, the court will treat those as admitted, too. Civil L.R. 56(b)(4) ("The Court will deem uncontroverted statements of material fact admitted solely for the purpose of deciding summary judgment."). For the most part, the facts consist of the allegations in the Duncans' Complaint, the Mannings' denials of many of those allegations, and the

2

provisions of two insurance policies. The court references additional portions of the Complaint for background or specificity.

On April 19, 2013, Alfonzo and Stephonia Duncan filed this case against Mark and Fredricka Manning. (Doc. 29 at 1.) The Mannings answered, denying the allegations in the Complaint and setting forth various affirmative defenses. (Doc. 11; Doc. 32 at 2.) The court has diversity jurisdiction, as the Duncans live in North Carolina, the Mannings live in Wisconsin, and the amount in controversy exceeds $75,000. (Doc. 1, ¶¶ 2-6.[1])

On July 1, 2011, SJNMA hired Alfonzo Duncan[2] as Director of Athletics and Head Varsity Basketball Coach. (Doc. 1, ¶ 7.) The Mannings' son was a student at SJNMA and a member of the varsity basketball team coached by Duncan. (Doc. 1, ¶ 5.) On February 28, 2012, Duncan and the varsity basketball team traveled to Columbus High School in Columbus, Wisconsin, for a basketball game. (Doc. 1, ¶ 8.) The Mannings' son did not play until the very end of the game. (Doc. 32 at 3.)

The Complaint asserts that at the game's conclusion, the Mannings left their bleacher seats and confronted Duncan by the locker room. (Doc. 1, ¶ 9.) It further contends the Mannings allegedly confronted Duncan in an aggressive manner and "verbally assaulted him" while Mark Manning pointed his finger at Duncan's chest. (*Id.*; *see* Doc. 29 at 1-2.) Mark Manning angrily yelled at Duncan, backed Duncan against a wall, intentionally bumped Duncan with his lower body, and lunged his head forward to strike Duncan in the head, causing physical pain. (Doc. 1, ¶¶ 10, 11.) The Mannings continued

---

[1] The Complaint asserts state residency rather than citizenship, but no party suggests that the parties' citizenship differs from their residency.

[2] As Stephonia Duncan does not factor into any allegations pertinent to this motion, "Duncan" will hereafter refer to Alfonzo Duncan.

3

to yell at Duncan in front of numerous people. (Doc. 1, ¶ 12.) Other parents and the Columbus High basketball coach stepped forward to intervene and restrain Mark Manning from further physically assaulting Duncan. (Doc. 1, ¶¶ 12, 13.)

Next the Complaint contends that the following morning, February 29, 2012, Mark Manning sent an email to SJNMA's Dean of Students, with a copy to SJNMA's president. (Doc. 1, ¶ 15; Doc. 29 at 2.) The dean met with Mark Manning that same morning. (Doc. 1 ¶ 15.) The Complaint further alleges that during the meeting with the dean, Mark Manning demanded that Duncan be terminated from his SJNMA position, based on "intentionally false and malicious statements" Mark Manning made regarding the incident of the night before. (Doc. 1, ¶ 16; Doc. 29 at 2.)

On February 29, 2012, Duncan was placed on administrative leave. (Doc. 1, ¶ 17; Doc. 29 at 2-3.) The Complaint asserts that Mark Manning's intentional false and malicious statements resulted in his being placed on administrative leave. (Doc.1, ¶ 17; Doc. 29 at 2-3.) The Complaint adds that on March 6, 2012, SJNMA terminated Duncan's position at SJNMA. (Doc. 1, ¶ 22; Doc. 29 at 4.) It also asserts that the Mannings' "false and malicious statements were causative of his termination." (Doc. 1, ¶ 22; Doc. 29 at 4.) Further, the Complaint states that on March 7, 2012, Manning was interviewed by the Columbus County police, to whom he "knowingly gave false information . . . by stating that no physical altercation occurred between himself and Mr. Duncan at the February 28, 2012 basketball game." (Doc.1, ¶ 18; Doc. 29 at 3.)

The Complaint expressly asserts three claims: (1) that "Mark Manning intentionally and maliciously assaulted and battered Alfonzo Duncan by striking him in the head" (Doc. 1, ¶ 24; Doc. 29 at 4); (2) that the Mannings "did intentionally and maliciously cause Mr.

4

Duncan to be terminated from SJNMA" (Doc. 1, ¶ 25; Doc. 29 at 5); and (3) that the Mannings violated Wis. Stat. § 134.01 "by concerting together for the purpose of willfully and maliciously injuring Alfonzo Duncan's reputation and profession by making false statements to the Dean of Students and President of SJNMA" (Doc. 1, ¶ 26; Doc. 29 at 5). The Complaint contends that Duncan suffered loss of his employment earnings and benefits, physical pain, severe emotional distress and dysfunction, as well as medical expenses. (Doc. 1, ¶ 27.)

The Mannings deny the allegations in the Complaint. They say, for instance, that they did not chase after Duncan, assault him, or intentionally bump or lunge or yell at him. (Doc. 32 at 3–5.) They deny that they intended to cause Duncan any harm, made any false and malicious statements to the dean or police, or demanded that Duncan be terminated. (Doc. 32 at 5–7.) They provide an affidavit of the president of SJNMA, attesting to and attaching his March 6, 2012, letter to Duncan asking for Duncan's resignation or, if not given, notifying Duncan of his termination. (Doc. 26; *id.* Ex. A.) The letter sets forth more bases for termination than just the postgame incidents of February 28 and the concerns of the Mannings. (*See* Doc. 26 Ex. A.)

American Family issued a homeowner's policy to the Mannings, policy number 48-CP4741-01, which was in effect from June 10, 2011 to June 10, 2012. (Doc. 22, ¶ 9; Doc. 29 at 5-6.) Policy number 48-CP4741-01 contains the following grant of liability coverage:

COVERAGE D - PERSONAL LIABILITY COVERAGE

We will pay, up to our limit, compensatory damages for which any insured is legally liable because of bodily injury or property damage caused by an occurrence covered by this policy.

> Defense Provision.
> If a suit is brought against any insured for damages because of bodily injury or property damage caused by an occurrence to which this policy applies, we will provide a defense at our expense by counsel of our choice. We will defend any suit or settle any claim for damages payable under this policy as we think proper.

(Doc. 22, ¶ 10, Ex B at 9 of 16; Doc. 29 at 6.) This policy defines "occurrence" as "an accident, including exposure to conditions, which results during the policy period, in: a. bodily injury; or b. property damage." (Doc. 22, ¶ 10, Ex B at 1 of 16; Doc. 29 at 6.)

Policy number 48-CP4741-01 contains an intentional-injury exclusion from such liability coverage, which reads:

> Intentional Injury. We will not cover bodily injury or property damage caused intentionally by or at the direction of any insured even if the actual bodily injury or property damage is different than that which was expected or intended from the standpoint of any insured.

(Doc. 22, ¶ 10, Ex B at 11 of 16; Doc. 29 at 7.) Further, the policy contains a punitive damages exclusion from personal liability coverage: "We will not cover punitive or exemplary damages." (Doc. 22, ¶ 10, Ex B at 12 of 16; Doc. 29 at 7.)

American Family issued an umbrella policy of liability insurance to the Mannings, policy number 48-U60980-01, which was in effect from March 12, 2011, to March 12, 2012. (Doc. 22, ¶ 11, Ex C; Doc. 29 at 7-8.) Policy number 48-U60980-01 contains the following grant of liability coverage:

> PERSONAL LIABILITY COVERAGE
> We will pay, up to our limit, compensatory damages for which an insured becomes legally liable for injury caused by an occurrence covered by this policy. This coverage applies only to damages in excess of the primary limit.
>
> DEFENSE PROVISION
> If a suit is brought against an insured for damages because of injury caused by an occurrence to which this policy applies, we will provide a defense at our expense by counsel of our choice.

6

(Doc. 22, ¶ 13, Ex C at 2 of 6; Doc. 29 at 8.)  "Injury" means "bodily injury, personal injury or property damage."  (Doc. 22, Ex. C at 1 of 6.)  Personal injury includes "[l]ibel, slander, humiliation or defamation of character."  (Doc. 22, Ex. C at 2 of 6; Doc. 32 at 7-8.)  "Occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period in personal injury and/or property damage."  (Doc. 22, ¶ 13, Ex C at 2 of 6; Doc. 29 at 8.)

The umbrella policy, too, contains an intentional-injury exclusion from liability coverage:

> Intentional Injury.  We will not cover injury caused by or at the direction of any insured even if the actual injury is different than that which was expected or intended from the standpoint of any insured.  This exclusion does not apply to personal injury when your actions are not fraudulent, criminal or malicious.

(Doc. 22, ¶ 13, Ex C at 4 of 6; Doc. 29 at 8-9.)  Further, this policy, too, contains a punitive damages exclusion: "We will not cover punitive or exemplary damages."  (Doc. 22, ¶ 13, Ex C at 4 of 6; Doc. 29 at 9.)

The Mannings tendered defense of the case to American Family under both policies.  American Family accepted defense under a reservation of rights and moved to intervene, bifurcate, and stay the case until coverage could be determined.  (*See* Doc. 15 at 2.)  The court granted the motion to intervene but denied the motion to bifurcate and stay.  (Doc. 21.)  This motion followed.

## DISCUSSION

In a diversity case, the court must apply state substantive law as enacted by the state legislature and as interpreted or declared by the state's highest court.  *See Home*

*Valu, Inc. v. Pep Boys—Manny, Moe and Jack of Del., Inc.*, 213 F.3d 960, 963 (7th Cir. 2000); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-79 (1938). No party disputes that Wisconsin law applies to the insurance issues in this case; American Family and the Mannings cite Wisconsin law when arguing this motion.

Interpretation of an insurance policy is governed by the rules of construction for contracts. *Estate of Sustache v. Am. Family Mut. Ins. Co.*, 2008 WI 87, ¶ 19, 311 Wis. 2d 548, ¶ 19, 751 N.W.2d 845, ¶ 19. The court interprets the policy language to effectuate the intent of the contracting parties. *Id.* Policy language is construed as it would be understood by a reasonable person in the insured's position. *Id.*: *Olson v. Farrar*, 2012 WI 3, ¶ 42, 338 Wis. 2d 215, ¶ 42, 809 N.W.2d 1, ¶ 42.

However, Wisconsin law heavily favors the insured in regard to the duty to defend. Hence, courts construe the allegations in a complaint liberally in the insured's favor. *Estate of Sustache*, 2008 WI 87, ¶ 21. Moreover, policy language is broadly construed and inferences are taken in the insured's favor. *See id.* Ambiguity in policy terms is construed against the insurer. *Id.*; *Olson*, 2012 WI 3, ¶ 42.

In Wisconsin, the duty to defend is broader than a duty of indemnification. *Olson*, 2012 WI 3, ¶ 29. Nevertheless, an insurer has a duty to defend "only if it could be held bound to indemnify the insured, assuming that the injured person proved the allegations of the complaint, regardless of the actual outcome of the case." *Estate of Sustache*, 2008 WI 87, ¶ 22. The duty to defend is first triggered by the allegations within the four corners of the complaint, and the nature of the alleged claim controls, even though the lawsuit may be groundless. *Id.* ¶ 20. The duty to defend arises from arguable, as opposed to actual, coverage. *Id.* Notably, the choice of legal theory stated in the tendered complaint is not

8

determinative of the duty to defend; the question instead is "whether that conduct as alleged in the complaint is at least arguably within one or more of the categories of wrongdoing that the policy covers." *Curtis–Universal, Inc. v. Sheboygan Emergency Med. Servs., Inc.*, 43 F.3d 1119, 1122 (7th Cir.1994); *see Strid v. Converse*, 111 Wis. 2d 418, 422–23, 331 N.W.2d 350 (1983) ("The operative facts themselves, if they show the invasion of a protected right, constitute the cause of action. What they are called is immaterial." (internal quotation marks omitted)). If there is a possibility of recovery on any covered claim in the complaint, an insurer must defend the entire lawsuit, even if other allegations are not covered by the insurance. *Fireman's Fund Ins. Co. v. Bradley Corp.*, 261 Wis. 2d 4, 19–20, 660 N.W.2d 666 (2003).

In determining whether there is a duty to defend or indemnify under an insurance policy, the court first decides whether the policy makes an initial grant of coverage. If no, the inquiry ends. *Estate of Sustache*, 2008 WI 87, ¶ 22. If yes, the court examines the policy's exclusions to determine whether they preclude coverage. *Id.* ¶ 23. Exclusion clauses are strictly construed against the insurer. *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 2004 WI 2, ¶ 24, 268 Wis. 2d 16, ¶ 24, 673 N.W.2d 65, ¶ 24. If an exclusion applies, the court then assesses whether an exemption to that exclusion reinstates coverage. *Id.*

If there is a question about the duty to defend, Wisconsin law favors a procedure by which the insurer either defends the policyholder subject to a reservation of rights or intervenes in the underlying lawsuit, requests a bifurcated trial on the issue of coverage, and moves for a stay of liability proceedings until the coverage issue is resolved. With these procedures, the insurer runs no risk of breaching its duty to defend. *Newhouse by Skow v. Citizens Sec. Mut. Ins. Co.*, 176 Wis.2d 824, 836, 501 N.W.2d 1 (1993).

Whether an insurer has a duty to defend is often a question of law based solely on the allegations within the four corners of the complaint and the terms of the insurance policy. *See Olson*, 2012 WI 3, ¶ 36. However, when the insurer has initially appointed counsel for the insured under a reservation of rights, intervened, and sought a determination of coverage, the purpose of the four-corners rule has been served and the court may allow supplementation of the complaint with affidavits or other evidence to enable it to determine whether coverage exists. *Olson*, 2012 WI 3, ¶¶ 3, 34, 38; *Estate of Sustache*, 2008 WI 87, ¶¶ 28-29. In other words, when the insurer's duty to continue to defend "is contingent upon the court's determination that the insured has coverage if the plaintiff proves his case," extrinsic evidence may be considered. *Estate of Sustache*, 2008 WI 87, ¶ 29.

Here, as was the case in *Olson*, *see* 2012 WI 3, ¶ 26, the insurer provided an initial defense for the insured under a reservation of rights, intervened and moved to bifurcate. Thus, this court is not limited to the four corners of the complaint.

At this point the decision is about indemnification, as well as the duty to defend. The insurer having protected its insured with a defense and itself from liability for breach of contract, means the four-corners rule is no longer implicated and that the court may proceed to determine coverage. *Id.* ¶ 34.

After considering the Mannings' evidence, as well as the allegations within the four corners of the Complaint the court finds that the Mannings have no coverage and American Family has no duty to defend under the Mannings' homeowner's policy or their umbrella policy regarding the claims expressly identified in the Complaint. Those claims fall outside the "accidents" that the policies cover.

10

Both policies cover occurrences, and an occurrence is an "accident" that results in bodily injury or property damage. "Accident" is not defined in either policy, but the term can be given its ordinary, common meaning and dictionary definition. *See Estate of Sustache*, 2008 WI 87, ¶ 34; *Doyle v. Engelke*, 219 Wis. 2d 277, 289, 580 N.W.2d 245 (1998). According to Black's Law Dictionary, an accident is "[a]n unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could not be reasonably anticipated." Black's Law Dictionary 15 (8th ed. 2004). Particularly as to accident policies, the word means "an event which takes place without one's foresight or expectation." *Id.* (quoting 1A John Alan Appleman & Jean Appleman, *Insurance Law & Practice* § 360, at 455 (rev. vol. 1981)). And for liability or personal injury policies, an accident depends on the degree of foreseeability and "the state of mind of the actor in intending or not intending the result." *Id.* at 15-16 (citing John F. Dobbyn, *Insurance Law in a Nutshell* 128 (3d ed. 1996). "Accidental" means "[n]ot having occurred as a result of anyone's purposeful act." *Id.* at 16. In reviewing an American Family policy similar to one in this case, the Supreme Court of Wisconsin referenced the following definition of "accident": an unexpected, undesirable event or unforeseen incident characterized by a lack of intention. *Estate of Sustache*, 2008 WI 87, ¶ 34 (citing *Doyle*, 219 Wis. 2d at 289.

In Wisconsin, a civil assault claim requires that the defendant (1) intended to cause physical harm to the plaintiff and (2) acted to cause the plaintiff to reasonably believe the defendant had the present intent and ability to harm the plaintiff. Wis. JI–Civil 2004. The requirement that the defendant intended to cause bodily harm means that the defendant had the mental purpose to cause bodily harm or was aware that his or her conduct was

11

practically certain to cause bodily harm to the plaintiff or another person. *Id.* Under Wisconsin law, the tort of battery by offensive contact occurs if (1) the defendant intentionally caused offensive contact with the plaintiff and (2) the plaintiff did not consent to the contact. Wis. JI–Civil 2005.5. The intent requirement means that the defendant had the mental purpose to cause the offensive contact or was aware that his or her conduct was practically certain to do so. Wis. JI–Civil 2005.5. The elements of a claim for tortious interference with a contract are (1) the plaintiff had a current or prospective contractual relationship with a third party; (2) the defendant interfered with that contractual relationship; (3) the interference was intentional; (4) a causal connection exists between the defendant's interference and the plaintiff's damages; and (5) the defendant was not justified or privileged to interfere. *Wolnak v. Cardiovascular & Thoracic Surgeons of Cent. Wisconsin, S.C.*, 2005 WI App 217, ¶ 14, 287 Wis. 2d 560, ¶ 14, 706 N.W.2d 667, ¶ 14. Thus, all of the claims expressly alleged in the Complaint require intent on the part of the defendant. Further, Duncan's allegations set forth intentional conduct that would satisfy these elements. (*See* Doc. 10.) The conduct as alleged in the Complaint was not an accident or accidental.

In *Estate of Sustache*, the complaint alleged that the defendant punched the decedent in the face, causing him to fall to the curb and sustain injuries that led to his death. 2008 WI 87, ¶ 5. There was no dispute that the defendant intended to strike the decedent. *Id.* The estate charged that the defendant committed battery without provocation by intentionally causing bodily harm to the decedent without the decedent's consent; the defendant claimed self-defense in response. *Id.* ¶ 7, 50. The Supreme Court of Wisconsin analyzed language of a homeowner's policy similar to the policies in this case

12

and concluded that the allegations, supplemented by deposition testimony, "cannot reasonably be construed to constitute a covered claim under the . . . homeowner's policy." *Id.* ¶ 51. The allegation that the defendant intentionally caused bodily harm to the decedent could not reasonably be characterized as action with a lack of intention. *Id.* ¶ 52. "One cannot 'accidentally' intentionally cause bodily harm." *Id.* The court concluded that "no reasonable person would regard the alleged intentional battery perpetrated by Jeffrey against Sustache as an 'unexpected . . . event,' or an 'unforeseen incident . . . characterized by a lack of intention.'" *Id.* ¶ 56. The volitional nature of an act removed it from coverage as an occurrence or accident. *See id.* ¶ 43.

Regarding the claims as pled (intentional assault, intentional battery by offensive conduct, and intentional interference with contract), the present case cannot be distinguished from *Estate of Sustache*. The Mannings' policies cover an occurrence, which means accident. Clearly, the Mannings could not accidentally have committed the intentional conduct alleged. No reasonable insured would regard an alleged intentional assault, intentional battery, or intentional interference with contract as unintended, unforeseen, taking place without expectation, not having occurred as a result of a purposeful act, or characterized by a lack of intention.

Regardless, the Mannings contend that their denials of the allegations and their affidavits disputing the accuracy of the facts mean that coverage exists; they dispute whether their actions were intentional and have provided evidence that they were not. But their denials do not alter the nature of the claims asserted. The duties to defend or indemnify arise from the possibility of coverage if a plaintiff is successful in proving his claims. Here, if the plaintiffs are successful no coverage exists under either policy because

13

the conduct was proved to be intentional. If the plaintiffs fail in proving their claims then no coverage exists because there is no liability at all. Either way, there is no coverage under the policy. Thus, American Family has no duty to continue to defend or indemnify the Mannings for damages based on these claims.

Asserting defenses to the allegations in the complaint does not obligate an insurer to defend against claims for which there is no coverage. Here, the denials of the assertions have no bearing on coverage. The types of facts discussed in *Olson* as being pertinent to coverage determinations involve things like whether an insured owned the vehicle at issue, whether a driver had permission to drive a vehicle, whether notice to the insured was timely, whether damage occurred during the policy period, or whether a particular tractor met the requirements of a "motor vehicle." 2012 WI 3, ¶ 36 & n.7, ¶¶ 45–46. Denials of a plaintiff's allegations do not affect the coverage determination when there is no possibility of coverage regardless of how a court or a jury might rule. "'The insurer's duty to continue to defend is contingent upon the court's determination that the insured has coverage if the plaintiff proves his case.'" *Olson*, 2012 WI 3, ¶ 38 (quoting *Estate of Sustache*, 2008 WI 87, ¶ 29).

*Estate of Sustache* indicates that if the case fails to give rise to initial coverage under the policy, the exclusions need not be considered. *See* 2008 WI 87, ¶ 58. Nevertheless, the court notes that the Mannings cannot avoid the intentional-conduct exclusions of both policies—because the claims involve intentional conduct.

As an alternative argument, the Mannings contend that the facts asserted in the Complaint include defamation, which is covered by the umbrella policy, even though the Duncans did not expressly plead such a claim. As noted above, the choice of legal theory

14

stated in the tendered complaint is not determinative of the duty to defend; the question instead is whether alleged conduct at least arguably falls within a category of coverage. *See Curtis–Universal, Inc.*, 43 F.3d at 1122.

In Wisconsin, the elements of a slanderous communication are (1) a false statement, (2) communicated by speech or conduct to a third person, (3) that is unprivileged and tends to harm one's reputation so as to lower that person in the estimation of the community or deters others from associating or dealing with the person. *Bradley Corp. v. Zurich Ins. Co.*, 984 F. Supp. 1193, 1199 (E.D. Wis. 1997) (Warren, J.); Wis. JI–Civil 2500, 2501. The statement need not be made or published with an intent to defame; the speaker's intention is not material. Wis. JI–Civil 2501. The Complaint references statements by Mark Manning during his meeting with the dean satisfying these elements. It asserts that Mark Manning made false statements that caused SJNMA to terminate Duncan, i.e., cease associating or dealing with him and damaged Duncan's reputation. (Doc. 1, ¶¶ 16, 22, 26.) Intent is not a required element of this claim; thus, the conduct is not automatically outside of the terms "accident" and "occurrence." As a result, the allegations fall within an initial grant of coverage in the umbrella policy.

The remaining question is whether that conduct falls within the intentional-conduct exclusion as well. The exclusion applies regarding "injury caused by or at the direction of any insured." (Doc. 22, ¶ 13, Ex C at 4 of 6; Doc. 29 at 8-9.) Duncan asserts that Mark Manning's statements were "intentionally false and malicious" regarding the incident following the basketball game and that Mark Manning demanded that Duncan be terminated. (Doc. 1, ¶ 16.) Thus, if plaintiffs proved their case exactly as alleged the exclusions clause could bar coverage because Mark Manning acted with intent to injure.

15

And notwithstanding that the exclusion contains an exception, that exception does not apply to malicious conduct.

But here, the elements of a defamation claim and the Mannings' evidence cause a different conclusion. The Mannings dispute whether their conduct was intentional and malicious. If the Duncans pursue a defamation claim and establish a false statement, but the jury fails to find any intent or maliciousness, the claim could arguably be covered. This court cannot say that the facts are undisputed and the intentional-conduct exclusion applies to such a defamation claim. Thus, the potential for coverage under the umbrella policy still exists. And because coverage arguably exists for this one claim, American Family must continue to defend the entire case under the umbrella policy.

If the Duncans never raise or argue a defamation claim, American Family may in the end need to provide no coverage for any damages the Duncans recover from the Mannings. But the duty to defend is broader than the duty to indemnify, and the *possibility* of recovery for a defamation claim means that a duty to defend exists under the umbrella policy. Nevertheless, the court concludes that the punitive-damages exclusion bars any coverage under the umbrella policy for punitive damages awarded on a defamation claim.

## CONCLUSION

Because the intentional conduct claims do not involve "accidents," they fall outside the coverage provisions of the Mannings' homeowner's and umbrella policies. However, the allegations of the Complaint give rise to a possible defamation claim that falls within the coverage provisions of the umbrella policy and the intentional-conduct exclusion does not necessarily apply. Hence, American Family must continue to defend under the

umbrella policy. Nevertheless, no coverage exists for any punitive damages award. Therefore,

IT IS ORDERED that American Family's motion for summary judgment and declaratory judgment (Doc. 23) is granted as to the homeowner's policy; no coverage or duty to defend exists under that policy.

IT IS FURTHER ORDERED that American Family's motion for summary judgment and declaratory judgment (Doc. 23) is granted in part and denied in part as to the umbrella policy; no coverage exists for the intentional conduct claims charged in the Complaint and for any punitive damages, but coverage may exist for a defamation claim. The duty to defend continues under the umbrella policy.

Dated at Milwaukee, Wisconsin, this 30th day of March, 2015.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE