ALFONZO C. DUNCAN,
STEPHONIA DUNCAN,

      Plaintiffs,

      v.                          Case No. 13-C-0437

MARK MANNING,
FREDRICKA MANNING,

      Defendants.

DECISION AND ORDER DENYING IN PART AND GRANTING IN PART
MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC.45) AND
SETTING A STATUS CONFERENCE

Alfonzo Duncan sues Mark and Fredricka Manning for assault and battery, tortious interference with contract, and violation of Wis. Stat. § 134.01 by conspiracy to injure Duncan's reputation and profession.[1] The Mannings move for partial summary judgment. They challenge the tortious interference and § 134.01 claims, contending that based on the undisputed facts no reasonable jury could find that they caused Duncan's termination from St. John's Northwestern Military Academy ("SJNMA") or that they conspired to injure Duncan's reputation or profession. They do not challenge the claims for assault and battery, recognizing that genuine issues of material fact exist for trial. (*See* Doc. 46 at 4 n.3.)

Summary judgment is proper if the depositions, documents or electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or

---

[1] Duncan's wife, Stephonia, adds a claim for loss of her husband's society and companionship. (Doc. 1, ¶ 28.) Because she does not factor into any of the events underlying the claims in the case, the court will refer to Alfonzo Duncan as "Duncan." The Mannings, who at times acted separately, will be referred to as "Mark" and "Fredricka" to differentiate them; they will be called "the Mannings" when the court refers to both of them. Their son will be referred to as "Frank."

other materials show that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating it is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend each element of its cause of action, showing that there exists a genuine issue for trial. *Id.* at 322-24. In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. To establish that a question of fact is "genuine," the nonmoving party must present specific and sufficient evidence that, if believed by a jury, would support a verdict in its favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249.

FACTS

The following facts are undisputed or taken in the light most favorable to Duncan.

On February 28, 2012, Mark and Fredricka's son, Frank, was a member of the SJNMA varsity basketball team, while Duncan was the SJNMA athletic director and head

2

coach of the SJNMA varsity basketball team. (Doc. 47, ¶¶ 1, 2.[2]) On that date, Mark and Fredricka, another son, Frank's grandfather, and three of the Mannings' neighbors, attended the SJNMA varsity basketball game played at the Columbus High School gym in Columbus, Wisconsin. (Doc. 47, ¶ 3.) The Mannings traveled for forty minutes to attend the game. (Doc. 58, ¶ 2.)

Duncan did not play Frank until about a minute before the game ended. (Doc. 47, ¶ 4; Doc. 58, ¶ 3.) A junior varsity player even entered the game before Frank did. (Doc. 58, ¶ 3.) Duncan declined to play Frank because he had been disrespectful when talking to Duncan at a previous game and because Frank had been late for practice several times. (Doc. 47, ¶ 9.) Duncan did not tell Frank that he was going to be punished or disciplined at the February 28 basketball game. (Doc. 47, ¶ 10.) When a basketball player at SJNMA did not get playing time as a punishment, Duncan did not tell the player why; the player would have to come to Duncan afterwards to find out why. (Doc. 47, ¶ 12.)

The Mannings and their neighbors discussed Frank's lack of playing time. (Doc. 58, ¶ 3.) Fredricka believed that her son had been humiliated and disappointed to play only the last minute when his family and friends were in attendance. (Doc. 58, ¶ 4.)

Following the game, the Mannings and their neighbors stood on the court. (Doc. 58, ¶ 5.) Mark then approached Duncan. (Doc. 47, ¶¶ 5, 6; Doc. 61, ¶¶ 5, 6; Doc. 48, Ex. A at 24-25.) Duncan was speaking with others, and Mark appeared to be waiting for the team scorekeeper to leave so he could speak with Duncan. (Doc. 58, ¶¶ 6, 7.)

---

[2]Document 47 is the Mannings' statement of proposed material facts. Document 58 is Duncan's statement of additional proposed material facts. Unless otherwise noted, the opposing party did not object to a cited statement (so it is taken as undisputed) or else a disputed fact has been construed in Duncan's favor.

3

Initially, Mark stood approximately three to four feet from Duncan and asked him, in a normal tone of voice, if Frank had gotten into some sort of trouble. (Doc. 47, ¶ 13; Doc. 58, ¶¶ 8, 10.) Fredricka moved closer and stood next to Mark as he spoke to Duncan. (Doc. 47, ¶ 7; Doc. 61, ¶ 7; Doc. 58, ¶ 14; Doc. 48, Ex. A at 27-28.) Duncan was leaning with his back against the gymnasium wall behind the team bench when Mark approached. (Doc. 58, ¶ 9.) He responded either that Frank had gotten into some trouble or was being disciplined. (Doc. 58, ¶ 10, Doc. 65, ¶ 10.) Manning asked Duncan if he treated all the players the same and moved to about two feet from Duncan. (Doc. 58, ¶ 12; Doc. 65, ¶ 12.) Duncan felt that Manning seemed more agitated or aggressive at that time. (Doc. 58, ¶ 12; Doc. 65, ¶ 12; Doc. 59, Ex. 1 at 124-25.) Duncan responded, in a calm manner, that he did treat players the same. (Doc. 59, Ex. 1 at 128; *see* Doc. 58, ¶ 13; *but see* Doc. 65, ¶ 13.[3]) Manning continued to move closer to Duncan and said, "Don't get smart with me, boy." (Doc. 59, Ex. 1 at 128-29; Doc. 58, ¶ 15; *but see* Doc. 65, ¶ 15.) Duncan is African-American and the Mannings are Caucasian. (Doc. 58, ¶ 16.) Duncan responded in a calm, relaxed manner. Manning was getting more aggressive while Duncan remained calm. (Doc.59, Ex. 1 at 131-32.) Fredricka yelled or screamed at Duncan about whether he treated all of the players the same. (Doc. 58, ¶ 18; Doc. 65, ¶ 18; Doc. 59, Ex. 1 at 137-38.)

---

[3] The Mannings have a different version of almost all events from this point onward until they left Columbus High School, but the facts are taken in Duncan's favor. The Mannings have testified or sworn that, among other things, Duncan put his finger in Manning's face, said he did not have to talk to Mark, told Mark he was messing with the wrong person, and raised his fists and went into a boxer's stance. (*See* Doc. 65, ¶¶ 13, 17.) They deny that Mark made the statement about getting "smart with me" as Duncan says. (*See* Doc. 48, Ex. C ¶ 15.) In their version of events, Duncan was aggressive toward them, and Fredricka yelled at Duncan only after he first yelled at her. (*See* Doc 63, Ex. A at 63.)

Mark then came closer to Duncan, bumped Duncan with his chest, and head-butted Duncan in the face. (Doc. 59, Ex. 1 at 133-36.) Duncan stepped and spun to get away. (Doc. 59, Ex. 1 at 136, 138; *see* Doc. 58, ¶ 21; Doc. 65, ¶ 21.) After spinning away from Mark and putting some distance between himself and the Mannings following the head-butt, Duncan went into a boxing stance. (Doc. 61, ¶ 14; Doc. 59, Ex. 1 at 139-40; Doc. 58, ¶ 22; *see* Doc. 65, ¶ 22.) Duncan maintained the boxing stance for three to four seconds then moved toward the locker rooms. (Doc. 47, ¶ 15; Doc. 58, ¶ 23.)

Mark started to come toward Duncan but people held Mark back. (Doc. 59, Ex. 1 at 142.) The Columbus High School coach told the Mannings to leave the gymnasium. (Doc. 58, ¶ 25; Doc. 65, ¶ 25; Doc. 59, Ex. 1 at 145.) Manning continued to try to fight Duncan, as bystanders restrained him and physically push him out of the gymnasium. (*See* Doc. 57.) Fredricka called Duncan an "F-ing liar" and said that he did not treat all of the players the same. (Doc. 59, Ex. 1 at 147-48.) Duncan feared for his life that night and thought he might never see his wife and children again. (Doc. 59, Ex. 1 at 170.)

Jack Albert, CEO of SJNMA, has also served as president for ten years. (Doc. 47, ¶ 18.) As president, Albert is responsible for the operation of SJNMA, including its employees and its students. (Doc. 47, ¶ 35.) Albert is responsible for hiring and firing employees. (Doc. 47, ¶ 36.) On February 28, 2012, Roy Berwick was the Executive Vice President and the second-highest official at SJNMA (Doc. 58, ¶ 33); John Thornburg was the Academic Dean at SJNMA but was not Duncan's supervisor. (Doc. 47, ¶¶ 17, 23.) Duncan was supervised by Albert and reported to him. (Doc. 47, ¶ 39.)

At 9:53 p.m. on February 28, 2012, the Mannings sent an email to Berwick, with copies to Albert and Thornburg, requesting a meeting "first thing in the morning" to discuss

5

an "incident" involving the basketball coach. They said they did not allow their son to travel on the team bus because they did not feel it was safe to have him with the coach. (Doc. 58, ¶ 32.) Fredricka intended to communicate that she thought Duncan's actions were inappropriate and that it was possibly unsafe for her son to be around Duncan. (Doc. 58, ¶ 34.)

Albert was at a conference on February 28, 2012, when he began to receive messages and called Thornburg. (Doc. 47, ¶ 20.) Albert asked Thornburg to meet with the Mannings, to listen to them, and to obtain as much information as possible. (Doc. 47, ¶ 21.) Thornburg was filling in because there was no one else on campus to handle the matter at the time. (Doc. 47, ¶ 19.)

Thornburg met with the Mannings at his office the next morning, February 29, 2012, at about 7:00 a.m. (Doc. 47, ¶ 19.) The Mannings were visibly upset while meeting with Thornburg because Frank had been humiliated. They told Thornburg that Duncan, in response to a question about playing time, pointed a finger in Mark's face, raised his fist and assumed a boxing stance, and stated "You want to fight? You are messing around with the wrong guy." (Doc. 58, ¶ 37.) The Mannings did not tell Thornburg that Mark had struck Duncan with his chest and head. (Doc. 58, ¶ 38.[4]) Fredricka asked Thornburg to remove Duncan from SJNMA because she felt his presence was dangerous and would affect her son's ability to participate in sports. (Doc. 58, ¶ 39.)

Thornburg documented the meeting in a "Record of Conversation," in which he relayed the Mannings' statements that Duncan, in response to a question about playing

---

[4] The Mannings say they did not tell Thornburg that Mark struck Duncan because it did not happen. (Doc. 65, ¶ 38.)

6

time, pointed a finger in Mark's face, raised his fist, assumed a boxer stance, and stated "You want to fight? You are messing around with the wrong guy." Thornburg then wrote:

> I do not have Alfonso's [sic] account, but I can only imagine he feels he is by himself without much support based on the relationship with some parents and when questioned by these parents he felt defensive. I would assume the negative nature of these relationships have [sic] been growing throughout the season.
>
> It is unfortunate that the parent/coach relationships deteriorated to such an extent as this past Tuesday evening. Our boys deserve a better experience and our school deserves better public demeanor. I cannot determine who is at fault, but if Alfonso responded in a[n] aggressive way to a parent in this situation, that is [an] offense not to be taken lightly.

(Doc. 59, Ex. 7 at 2; Doc. 61, ¶ 24; Doc. 59, Ex. 7; Doc. 58, ¶ 40; Doc. 65, ¶ 40.) After meeting with the Mannings on February 29, Thornburg asked the Mannings to send him an email recapping the events of February 28 so it would be in writing. (Doc. 47, ¶ 22.) Thornburg never interviewed Duncan about the specifics of the incident. (Doc. 58, ¶ 54.)

Albert read Thornburg's Record of Conversation and spoke to Thornburg about it. (Doc. 58, ¶ 41.) Thus, he became aware of Fredricka's statement that she wanted Duncan removed from SJNMA. (Doc. 58, ¶ 41.)

Duncan went to SJNMA the morning of February 29 intending to notify school officials that he would file a police report with the Columbus Police Department. (Doc. 59, Ex. 1 at 155-56.) Around 8:30 a.m., Duncan was notified by the SJNMA business manager that he was suspended, and Duncan went home. (Doc. 59, Ex. 1 at 154-55.) After Duncan left, he went to the Columbus Police Department and wrote out an incident report. (Doc. 58, ¶ 45.)

Later on February 29, the Mannings sent Thornburg an email recounting their version of the events of the evening before. Fredricka typed the email and Mark

7

contributed facts to it. (Doc. 58, ¶ 46; Doc. 65, ¶ 46.; *see* Doc. 59, Ex. 6.) Mark has said the email was sent on behalf of Fredricka and himself. (Doc. 48, Ex. C, ¶ 8.) In the email, the Mannings wrote that Duncan put his finger in Mark's face, told Mark that he was "messing with the wrong person," raised his fists, challenged Mark to a fight, went into a boxing stance, and rolled his fists back and forth in Mark's face. The email also stated that the Mannings wanted to make it "perfectly clear" that Duncan's assertion that Mark had head-butted him was a "false statement." Further, the Mannings stated that "this is not a basketball issue nor an issue of playing time," but rather that Duncan had a "violent demeanor" and that they were removing their son from the basketball team for his safety. (Doc. 58, ¶ 47; Doc. 59, Ex. 6 at 2.)

During the afternoon of February 29, Fredricka forwarded a copy of the email sent to Thornburg to Amy Pfister (apparently a parent of another SJNMA student, though it is unclear from the documents before the court) and to one of the neighbors who attended the game on February 28. (Doc. 58, ¶ 48; Doc. 65, ¶ 48.) The next day, Fredricka asked Pfister to forward the email to a David Carl. (Doc. 58, ¶ 51; Doc. 65, ¶ 51; Doc. 59, Exs. 11 at 5, 14.)

When Albert returned to SJNMA, apparently on or around March 1, 2012 (*see* Doc. 48, Ex. E at 20-21), he called Duncan in to hear his side of the story. (Doc. 47, ¶ 25; Doc. 58, ¶ 49; Doc. 59, Ex. 1 at 158; *see* Doc. 58, ¶ 53; Doc. 48, Ex. E at 21.) Duncan said, among other things, that he had been head-butted by Mark. Albert responded that he did not see any marks on Duncan's face that would indicate that it happened. (Doc. 58, ¶ 53; Doc. 65, ¶ 53.) Additionally, Albert asked Duncan why he did not just walk away from the

8

confrontation, to which Duncan replied that he did not do so because he was cornered.[5] (Doc. 56, ¶ 3; Doc. 61, ¶ 26.) Albert told Duncan that the incident should not have happened. (Doc. 58, ¶ 49.) Albert placed Duncan on administrative leave with pay because there was another basketball game that night and he did not know what might happen if Duncan was permitted to go to the game; Albert needed more time to fully explore what had happened. (Doc. 47, ¶ 27.) Furthermore, he was concerned about the community, the students, and the school's reputation. (Doc. 47, ¶ 28.)

Albert received a telephone call from Mark the morning of March 1, 2012. Mark said he was sorry that the situation occurred but told Albert that Duncan held up his fists and acted like he wanted to spar with him. (Doc. 47, ¶ 29; Doc. 61, ¶ 29; *see* Doc. 61, ¶ 29; Doc. 58, ¶ 50.) Additionally, Mark claimed he never touched Duncan but admitted he "got in Mr. Duncan's face." (Doc. 58, ¶ 50.) He added that he was disappointed with Duncan's lack of professionalism and still believed Duncan was wrong. (Doc. 47, ¶ 30; Doc. 58, ¶ 50.) But he never said to Albert that Duncan ought to be fired. (Doc. 47, ¶ 30; Doc. 58, ¶ 50.) However, Mark relayed to Albert that he had told Duncan during the incident that Mark was a "paying parent, a client," so Duncan had to speak with him. (Doc. 58, ¶ 50; Doc. 65, ¶ 50; Doc 59, Ex. 2 at 24-25.) Tuition at SJNMA is approximately $30,000 per year. (Doc. 58, ¶ 1.)

Albert did not speak to other witnesses to the February 28 incident. However, he did speak with Sean Keating, an assistant coach, who had heard but not seen the incident because he had gone to the locker room. (Doc. 58, ¶ 52; Doc. 65, ¶ 52.) (According to the

---

[5] Albert says Duncan replied that he had been challenged (Doc. 48, Ex. E at 23.) But the facts are taken in Duncan's favor.

9

Mannings, none of Albert's staff said to him that they had witnessed the confrontation at the game. (*See* Doc. 65, ¶ 52.))

Albert prepared a letter asking for Duncan's resignation. (Doc. 47, ¶ 50.) On March 6, 2012, he and Thornburg met with Duncan and gave him a letter. In the letter's opening paragraph, Albert said he reviewed a series of documents reporting on the "unfortunate situation" involving Duncan and a parent at the Columbus basketball game and that the incident was "the kind of event that appears to have created an environment that may be beyond our ability to repair without a major change in the program." (Doc. 58, ¶ 55.) The letter asked for Duncan's immediate resignation and closed with: "It should be understood that your failure to resign your position will result in your immediate termination." (Doc. 58, ¶ 56.) Albert read the letter to Duncan. (Doc. 58, ¶ 56.) After giving Duncan a separation agreement, Albert wanted to go over the agreement with Duncan, but Duncan refused. (Doc. 47, ¶ 51.) Duncan took a copy of the letter along with the separation agreement and left without tendering his resignation. (Doc. 47, ¶ 52.) Albert did not hear back from Duncan until SJNMA received the notarized separation agreement. (Doc. 47, ¶ 52; *see* Doc. 65, ¶ 57.) On Wednesday, March 7, the SJNMA comptroller canceled Duncan's health and dental insurance, effective March 6, 2012, and indicated that he had been "discharged." (Doc. 58, ¶ 58; Doc. 59, Ex. 9.)

Albert had not decided to terminate Duncan or not renew his employment agreement before the February 28, 2012, incident. (Doc. 58, ¶ 59.) And, before February 2012, Thornburg had not received any complaints about Duncan from any parents. (Doc. 58, ¶ 60.) Nor had Duncan received any write-ups at SJNMA prior to February 28, 2012. (Doc. 58, ¶ 62.) Duncan's employment file contained no write-ups, memorandums,

10

warnings, or documents of any sort created before February 28, 2012, that reflected any complaints or concerns about Duncan's work performance. (Doc. 58, ¶ 61.)

Duncan had been hired as of July 1, 2011, as the athletic director and head basketball coach at SJNMA. (Doc. 47, ¶ 37.) Even though there were no warnings or documents regarding complaints in Duncan's personnel file, his employment had not been smooth sailing between July 1, 2011, and February 28, 2012. Albert has stated that if he put a letter in Duncan's file every time there was an issue with him at SJNMA, he would have been "writing continually" and that he was "waiting to see correction." (Doc. 47, ¶ 70.) He said that the incident between Duncan and the Mannings was the "tip of the iceberg." (Doc. 59, Ex. 2 at 27.) For instance, during Duncan's first day on the job, the vice president for major gifts and strategic planning at SJNMA told Albert that he needed to fire Duncan after Duncan was rude and accusatory toward the vice president. (Doc. 47, ¶ 40; Doc. 48, Ex. E at 14-15.) Although he did not reprimand Duncan in writing, Albert informed Duncan that he had just insulted one of the senior vice presidents in the school, and he needed to "get it fixed now or this may be a short-term experience for you." (Doc. 47, ¶ 41.)

Albert believed Duncan had a difficult time integrating into the SJNMA community. (Doc. 47, ¶ 42.) Although Albert encouraged Duncan to join others in the dining hall where the boys, faculty and staff ate lunch together at SJNMA, Duncan would not join them. (Doc. 47, ¶ 43.) Albert felt that Duncan spent an inordinate amount of time on tasks other than building relationships, understanding the coaches, and other things that Albert talked to Duncan about. (Doc. 47, ¶ 44.) Albert felt that Duncan spent most of his time during the football season collecting ticket money, and he told Duncan that he should assign the

11

task to someone else and develop relationships with people instead. (Doc. 47, ¶ 46.) Duncan repeatedly collected ticket money from a major donor who was responsible for the construction of the locker rooms at SJNMA, which disturbed and frustrated Albert. (Doc. 47, ¶ 47.) Albert has stated that there was an issue regarding how Duncan dealt with the football coach, who had been at SJNMA for seventeen years (Doc. 47, ¶ 45) and that there "was no communication" between Duncan and the other staff at SJNMA, which was a "significant" problem (Doc. 47, ¶ 57).

Organization is important at a military academy, as SJNMA expects students to have their beds made and be in uniform, and organization and time management are all key to the boys' success. (Doc. 47, ¶ 54.) Coaches, boys and parents who went to Duncan's office could see it was disheveled, and the office was on the "gateway" when parents came to a gym function at SJNMA. (Doc. 47, ¶ 55.)

According to Albert, other issues during Duncan's tenure as athletic director and basketball coach included, among other things, games not being videotaped (Doc. 47, ¶ 58); a lack of statistic record-keeping (Doc. 47, ¶ 59; Doc. 61, ¶ 59; Doc. 60, Ex. 1 at 94); and failure to arrange with food service for meals missed by hockey players, which caused parents to complain to Albert (Doc. 47, ¶ 67). However, Albert did not criticize Duncan for all of these things before he was told that he would be terminated. (*See, e.g.*, Doc. 61, ¶ 58 (Duncan not criticized for failing to videotape varsity basketball games); Doc. 60, Ex. 1 at 92.)

In addition, Duncan derided the previous SJNMA basketball coach during an interview with a local reporter. (Doc. 47, ¶ 62.) Following the interview, Albert told Duncan that his comments caused a problem, that he was not helping Albert, and that "[i]t's getting

12

worse." (Doc. 47, ¶ 63.) Further, two alumni reported to Albert that Duncan used the term "bastard" when talking about two cadets in the weight program; Duncan never denied the comment. (Doc. 47, ¶ 65.) After Albert was informed of Duncan's language about the two cadets, he told Duncan he would not tolerate it and the next time Albert got such a report, there would be, at a minimum, a letter of reprimand in his file, and that the third time Duncan would no longer be at SJNMA. (Doc. 47, ¶ 66.) Duncan does not deny these incidents. (Doc. 61, ¶¶ 62, 63, 65, 66.)

SJNMA employees are given annual letters of agreement, which must be renewed. The process to renew letters of agreement usually begins in May of each year. (Doc. 58, ¶ 66.) SJNMA's fiscal year is July 1 to June 30. (Doc. 58, ¶ 65.) Albert says that although he had not decided before the February 28 incident whether to terminate Duncan at the end of the contract year, he had decided to have a serious conversation with him at contract renewal time. (Doc. 47, ¶ 49; Doc. 59, Ex. 2 at 27.) Prior to that point in March, he had not made up his mind whether he was going to terminate Duncan or not renew his agreement. (Doc. 47, ¶¶ 77, 78; Doc. 61, ¶ 77; Doc. 48, Ex. E at 48.) However, had the February 28, 2012, incident not occurred, "probably what would have happened, unless there had been another incident, we would have probably sat with him at the end of the year and sat down and said, okay, this is what we're dealing with again." (Doc. 59, Ex. 2 at 48; *see* Doc. 58, ¶ 63; Doc. 65, ¶ 63.)

After the previous athletic director had allowed the program to become ineffective in a number of ways, Albert offered him a coaching job and worked diligently not to reduce his pay. (Doc. 58, ¶ 67.)

13

Prior to preparing the March 6, 2012, letter to Duncan, Albert spoke with Berwick, Thompson, the school's attorney, and the vice-president for business. (Doc. 47, ¶ 81.) However, Albert consulted only with the school's attorney when preparing the March 6 letter. (Doc. 47, ¶ 82.) The information in the March 6 letter came from Albert's memory and his experiences with Duncan. (Doc. 47, ¶ 83.) He was not required to consult with anyone at SJNMA to request that Duncan resign or be terminated; Albert alone made the decision to terminate Duncan. (Doc. 47, ¶ 84.) It was solely within his discretion, as president of SJNMA, to fire Duncan. (Doc. 47, ¶ 85.)

After the meeting on March 6, Albert called Mark and informed him that Duncan had been terminated. He said that Mark was not the only reason Duncan was being terminated. (Doc. 48, ¶ 64; Doc. 65, ¶ 64; Doc. 59, Ex. 17 at 2 (Fredricka's account stating that Albert "made a point to Mark, saying that he was in no way the only reason for which Mr. Duncan was let go as there were many").)

Albert has stated even if a parent told him that someone should be fired, he would dig his heels in, because if he let parents tell him how to run his school, he would be in bad shape. (Doc. 47, ¶ 48.) While he was aware that Fredricka said that she would like Duncan removed from the academy, Albert told Thornburg and everyone else in the office at the time of the remark that Fredricka did not tell him how to run the school. (Doc. 47, ¶ 79.)

According to Albert, nothing the Mannings said to him was a substantial factor in his decision to terminate Duncan. (Doc. 47, ¶¶ 75, 76; Doc. 61, ¶¶ 75, 76.) And Fredricka's suggestion that Duncan be fired "absolutely" did not weigh into his decision to terminate Duncan or have him resign. (Doc. 47, ¶ 80; Doc. 61, ¶ 80; Doc. 48, Ex. 3 at 63.) Albert

14

maintains that a plethora of reasons led to his decision and that he realized the incident between the Mannings and Duncan was yet another incident that he had to manage. (Doc. 47, ¶¶ 77, 78; Doc. 61, ¶ 77; Doc. 48, Ex. E at 48.) Albert says that after his investigation of the incident that occurred on February 28, 2012, his sole issue with Duncan's involvement was Duncan's decision not to just walk away. (Doc. 47, ¶ 86; Doc. 61, ¶ 86.)

ANALYSIS

A.  Tortious Interference with Contract Claim

Under Wisconsin law, to recover on a claim for intentional interference with contract, Duncan must show that (1) he had a contract or prospective contractual relationship with a third party, (2) the Mannings interfered with that contractual relationship, (3) the interference was intentional, (4) a causal connection exists between the Mannings' interference and Duncan's damages, and (5) the Mannings were not justified or privileged to interfere. *See Wolnak v. Cardiovascular & Thoracic Surgeons of Cent. Wis., S.C.*, 2005 WI App 217, ¶ 14, 287 Wis. 2d 560, ¶ 14, 706 N.W.2d 667, ¶ 14; Wis. JI–Civ. 2780. The Mannings contend that Duncan fails to proffer any evidence regarding the fourth element, causation. To prove causation, Duncan must show that the Mannings' actions were a "substantial factor" in producing the harm to him. *See Wolnak*, 2005 WI App 217, ¶ 15. "Substantial factor" means that the conduct "has such an effect in producing the harm as to lead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense." *Id.* (internal quotation marks omitted).

According to the Mannings, the undisputed evidence shows that SJNMA President Albert decided to fire Duncan (or ask for his resignation) on his own, with no influence from the Mannings. The Mannings point to Albert's testimony that the February 28 incident was

15

the "tip of the iceberg," that Fredricka's request did not factor into his decision, that he had a plethora of reasons to terminate Duncan, and that his main issue with the incident was that Duncan did not simply walk away when confronted by the Mannings.

The court determines that a genuine issue of material fact exists. Regardless of what Albert now says, Fredricka called for Duncan's removal and Albert was aware of that request or demand, and then, very importantly, after terminating Duncan, Albert called Mark to report that outcome to the Mannings. Contrary to Albert's statement (at deposition a couple years after Duncan was terminated) that Fredricka's request played no part in his decision, around March 6, 2012, Albert told Mark that the Mannings' complaints were not the *only* reason that Duncan was fired. Hence, based on Albert's statement that was made contemporaneous with Duncan's termination, a jury could find that the Mannings' complaints and request were indeed considered by Albert and were a substantial factor (even if not the sole reason) in Albert's decision to terminate Duncan. Albert did not decide to terminate Duncan prior to the incident with the Mannings on February 28; at most, Albert thought he would talk seriously with Duncan at contract renewal time months later. And even if a discussion were to occur regarding contract renewal, Albert had not thought any problems with Duncan large enough to document in Duncan's personnel file, and a prior athletic director with performance issues was not terminated by Albert; instead, he was reassigned to a different position, thereby suggesting that Duncan may have kept a position at the school for the next contract year but for the actions and statements of Mark and Fredricka. Further, Mark referenced in a phone call with Albert that he was a paying parent, and previously Albert had been upset with Duncan for treating a donor poorly by charging the donor admission fees. A reasonable jury could conclude that the Mannings'

16

complaints and request were a substantial factor in Albert's change of heart about a future contract talk with Duncan to terminating Duncan immediately. Albert obtained no eyewitness accounts of the incident other than the Mannings' and Duncan's before deciding to terminate Duncan. In Albert's meeting with Duncan, Albert's comments suggested he disbelieved Duncan about being head-butted by Mark, and Albert said that the incident should not have happened. Yet taking the facts in Duncan's favor Duncan did not instigate the incident at all—the Mannings did—and he *was* head-butted. A reasonable jury could find that Albert sided with the Mannings notwithstanding that the facts tilted Duncan's way. Finally, Albert remembers Duncan saying that he put up his fists only when "challenged" by Mark, yet the fact (for summary judgment purposes) is that Duncan said he put up his fists only when "cornered" by Mark. Albert's use of the word "challenge" comports with Mark and Fredricka's version of events rather than Duncan's, suggesting that Mark and Fredricka exerted influence in Albert's thought processes. Thus, a rational jury could find in Duncan's favor.

B. Conspiracy Claim

Wisconsin Statute § 134.01 states:

Injury to business; restraint of will. Any 2 or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of willfully or maliciously injuring another in his or her reputation, trade, business or profession by any means whatever . . . shall be punished by imprisonment in the county jail not more than one year or by fine not exceeding $500.

Although § 134.01 is a criminal statute, it provides a basis for civil tort liability as well. *Brew City Redev. Group, LLC v. Ferchill Group*, 2006 WI 128, ¶ 19, 297 Wis. 2d 606, ¶ 19, 724 N.W.2d 879, ¶ 19. To prove a claim for conspiracy to injure reputation under § 134.01, a

17

Case 2:13-cv-00437-CNC   Filed 09/11/15   Page 17 of 20   Document 67

plaintiff must prove that (1) the defendants acted together, (2) the defendants acted with a common purpose to injure the plaintiff's reputation and business, (3) the defendants acted with malice, and (4) the acts financially injured the plaintiff. *Carlson v. City of Delafield*, 779 F. Supp. 2d 928, 946 (E.D. Wis. 2011); Wis. JI–Civil 2820. The Mannings contend that no reasonable jury could find in Duncan's favor on any of the elements.

Sufficient evidence supports the first two elements. The first two elements of a conspiracy claim under § 134.01 require facts showing some agreement, explicit or otherwise, between the alleged conspirators on the common end sought, and some cooperation toward the attainment of that end. *Carlson*, 779 F. Supp. 2d at 946-47. Fredricka and Mark together addressed Duncan on the basketball court after a game on November 28; Fredricka stood by Mark as he confronted Duncan, then yelled at Duncan. The Mannings jointly wrote, edited, and sent an email to and met with Thornburg the morning of February 29, at which time they together provided Thornburg with a false report of the events the night before (taking the actual facts in Duncan's favor). At the joint meeting, Fredricka called for Duncan's removal from SJNMA, and it does not appear that Mark objected to that request. When Albert reported back to the Mannings about Duncan's termination, Albert spoke to Mark (not Fredricka) about it, suggesting an implicit agreement between the Mannings about seeking Duncan's removal, which could be considered injury to profession. Further, Fredricka forwarded the Mannings' February 29 email about the events of February 28 to at least one other person and asked that person to forward it to another, suggesting that the Mannings sought to injure Duncan's reputation with others.

Additionally, as the discussion in the previous section indicates, there is sufficient evidence regarding causation of injury. A reasonable jury could find that the Mannings'

18

actions caused financial injury to Duncan. However, no reasonable jury could find the element of malice on the present record.

Malice must be proved as to both conspirators. *Maleki v. Fine-Lando Clinic Chartered, S.C.*, 162 Wis. 2d 73, 86, 469 N.W.2d 629 (1991). "Malice" demands more than simply an intent to do harm. *Brew City Redev. Group*, 2006 WI 128, ¶ 23 n.7. "It requires inflicting a harm for the sake of harm as an end in itself, and not merely as a means to some further end legitimately desired." *Id.* (internal quotation marks omitted). Further, to establish a civil conspiracy, more than mere reliance on reasonable inferences is required. A plaintiff "must show more than a mere suspicion or conjecture that there was a conspiracy or that there was evidence of the elements of a conspiracy." *Maleki*, 162 Wis. 2d at 84. "In Wisconsin, if circumstantial evidence supports equal inferences of lawful action and unlawful action, then the claim of conspiracy [under § 134.01] is not proven." *Allen & O'Hara, Inc. v. Barrett Wrecking, Inc.*, 898 F.2d 512, 516 (7th Cir. 1990).

Duncan's evidence is not sufficient for a jury to find that the Mannings intended harm to Duncan for harm's sake. Instead, they were parents reacting to their son's lack of playing time. Fredricka believed Frank had been humiliated, but no evidence indicates that the Mannings sought Duncan's humiliation or injury to reputation or profession as retaliation. Instead, the evidence suggests that they sought a change to their son's basketball or other sports experiences. They may have been angry, but they were angry about Duncan's coaching of the game and handling of the basketball team, and all reasonable inferences suggest that at most they sought to remove him from the coaching or athletic director position so their son and other students could play sports under someone else, not to harm Duncan for any other reason.

19

CONCLUSION

For the reasons set forth above,

IT IS ORDERED that the Mannings' motion for partial summary judgment (Doc. 45) is denied regarding the tortious interference claim and granted as to the claim under Wis. Stat. § 134.01.

IT IS FURTHER ORDERED that a status conference is set for October 21, 2015, at 2:00 p.m. in Courtroom 222 to set final pretrial conference and trial dates.

Dated at Milwaukee, Wisconsin, this 11th day of September, 2015.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE